```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```

HAROLD D. HOGAN,

        Plaintiff,

   -vs-

CAROLYN COLVIN, Acting Commissioner
of Social Security,

        Defendant.

**DECISION AND ORDER
No. 1:12-cv-1093(MAT)**

## I. Introduction

Harold D. Hogan ("Plaintiff"), represented by counsel, commenced this action challenging the final decision of the Commissioner of the Social Security Administration ("the Commissioner") denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act") and supplemental security income ("SSI") under Title XVI of the Act. The Court has jurisdiction over this matter pursuant to 42 U.S.C. § 405(g).

## II. Procedural Status

On April 15, 2010, Plaintiff filed a DIB application, alleging disability commencing October 13, 2008. T.115-26.[1] The claim was denied on September 8, 2010. On September 30, 2010, a hearing was

---

[1] Citations to "T." refer to pages in the certified copy of the administrative transcript, filed by the Commissioner in connection with her Answer to the Complaint.

held before administrative law judge David Z. Nisnewitz ("the ALJ") in Jamaica, New York. Plaintiff appeared pro se and testified, as did medical expert Charles M. Plotz, M.D., and vocational expert Andrew Pasternak. T.34-66. On December 22, 2010, the ALJ issued an unfavorable decision. T.17-33. Plaintiff filed a request for review which the Appeals Council denied on September 13, 2012, making the ALJ's decision the final decision of the Commissioner. This timely action followed.

**III. Summary of the Administrative Transcript**

   **A. Relevant Medical Evidence: Physical Impairments**

Plaintiff treated at the Queens Long Island Medical Group, P.C. for a right knee impairment starting in March 31, 2010. See T.230-52, 346-462. Walter Yee, M.D. assessed hypertension and internal derangement of the right knee. T.241, 373, 394, 395, 397, 424, 429, 431, 436. Plaintiff was using a knee brace. Dr. Yee recommended physical therapy treatment and non-steroidal anti-inflammatory medications including diclofenac sodium (Voltaren). T.346, 373. An MRI dated April 23, 2010, showed a mild focal linear signal, mild cartilage degeneration, and a small Baker's cyst in Plaintiff's right knee. T.320, 410.

Samir Dutta, M.D., performed a consultative orthopedic examination of Plaintiff on August 6, 2010. T.285-90. Plaintiff arrived in a wheelchair, wearing a right knee brace, but he was able to stand and walk without both. T.286. Plaintiff declined to

squat or walk on his heels and toes but was able to move on and off a chair and the examination table without difficulty. T.286. He weighed 348 pounds and was 5'9" tall. Dr. Dutta observed a loss of range of motion ("ROM") in Plaintiff's cervical spine, lumbar spine, hips, and shoulders, but the rest of Plaintiff's extremities all exhibited full ROM. Plaintiff's strength was full and he was negative for spasms, trigger points, muscle atrophy, sensory abnormalities, scoliosis, kyphosis, joint effusion, or joint instability. Hand and finger dexterity was intact and grip strength was full. Plaintiff stated that he was able to clean the house, shop, shower, bathe, dress, read, do laundry, and go out to different places. T.285. Dr. Dutta opined that Plaintiff had mild limitations in sitting and standing; and mild to moderate limitations in walking, bending, lifting, and carrying heavy weight on a continuous basis on the right side. T.287. Dr. Dutta also stated that Plaintiff's obesity was a medical issue which precluded normal ambulation and activity. T.287.

Dr. Plotz testified as a medical expert witness at the administrative hearing. According to Dr. Plotz, Plaintiff's main medical problem was his obesity; his right knee and back impairments were mild. T.49. Dr. Plotz stated that Plaintiff had no limitation in sitting; could stand and walk for 6 hours in an 8-hour workday; and could lift and carry at least 20 pounds. T.57.

**B.   Relevant Medical Evidence: Mental Impairments**

VESID Panel Psychologist Dr. Gus C. Papapertrou conducted an evaluation of Plaintiff on February 10, 2006. See T.277-80. Plaintiff's affect was appropriate, and his general mood level was neutral. Although Plaintiff showed some impulsivity and covert anxiety, he did not reveal any formal thought disorder. Dr. Papapertrou administered several tests, including the Wechsler Adult Intelligence Scale-Third Edition. Plaintiff's verbal I.Q. was 87 (low average), his performance I.Q. was 99 (average), and his full scale I.Q. was 91 (average). In Dr. Papapertrou's opinion, Plaintiff had a learning disability in the verbal areas of cognitive functioning, and needed a "hands-on" vocation with a minimal arithmetic component. Plaintiff had expressed interest in building maintenance, locksmithing, and soldering, which were trades Dr. Papapertrou believed could be a good fit for him.

Dr. Michael Alexander conducted a consultative psychological examination of Plaintiff on August 6, 2010. T.281-84. Dr. Alexander noted that Plaintiff's speech, affect, mood, orientation, attention, concentration, memory, insight, and judgment were normal; and his thought processes were coherent and goal directed. He was able to count, perform simple calculations, do "serial 3s", identify and remember objects after 5 minutes, and recite 7 digits forward and 4 backwards. Dr. Alexander found no evidence of depressive or anxiety-related symptoms. T.281. Plaintiff was able to dress, bathe, and groom himself; read; manage money; use public

transportation; and maintain relationships with friends and family. He was able to follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, maintain a regular schedule, learn new tasks, make appropriate decisions, relate adequately with others, and appropriately deal with stress. Dr. Alexander stated that the "[r]esults of the examination do not appear to be consistent with any psychiatric problems, which would interfere with [his] his ability to function on a daily basis." T.283. Dr. Alexander did not diagnose Plaintiff as having any type of mental disorder, and stated that his prognosis was "good". T.284.

### C. Vocational and Non-Medical Evidence

Plaintiff was 32-years-old as of the disability onset date, had graduated from high school, and could communicate in English. T.37. He had past relevant work as a carpenter and warehouse worker. T.38-39. Plaintiff testified that he lived with his mother, who was in poor health. He did the shopping for her and helped her around the house. He testified that he was able to shop, vacuum, sweep, do dishes, make beds, and carry up to two bags of groceries weighing up to 20 pounds. T.41. He estimated that he could stand for "[t]wenty minutes to [sic] more" and testified that sitting did not bother him. He estimated that he could walk for about 3 to 6 blocks with a brief rest period after about a block and a half. T.42-43. Plaintiff stated that he was 6'1" and weighed 325 pounds.

T.44.

The VE testified at the hearing that Plaintiff's past relevant work as a carpenter was semi-skilled in complexity with a medium exertional demand. His previous job as a warehouse worker was unskilled in complexity with a medium exertional demand. T.57. The ALJ posed a hypothetical regarding an individual of Plaintiff's age and with his education and work history. The VE testified that such an individual could work as an assembler (semi-skilled, SVP 3, light exertion). T.59. Such a hypothetical individual also was employable as a fire equipment inspector (semi-skilled, SVP 4, light exertion) and as a toy/sporting equipment inspector (semi-skilled, SVP 3, light exertion). T.58-60. In total, there were 5,700 of these jobs locally and 571,000 of them nationally. The VE testified that the hypothetical individual could work as a lock assembler or repairer (semi-skilled, SVP 3, sedentary). T.62. There were more than 2,000 of the lock assembler and lock repairer jobs locally and more than 100,000 of them nationally.

**IV.   Standard of Review**

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37

(2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

A deferential standard does not apply to the Commissioner's application of the law, however, and this Court independently must determine if the Commissioner applied the correct legal standards in arriving at her decision. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984) ("Failure to apply the correct legal standards is grounds for reversal."). Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and, if the standards were correctly applied, then considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

**V.   Discussion**

    **A.   Step Three Error**

At step three of the sequential evaluation, the ALJ found that

none of Plaintiff's "severe" impairments (back impairment, right knee impairment, hypertension, and obesity) either singly or in combination, met or medically equaled the criteria of any listed impairment. The ALJ noted that "[n]o treating or examining physician" had "mentioned findings equivalent in severity" to any listed impairment. In addition, the ALJ found, the medical expert testified that none of Plaintiff's impairments met or equaled the criteria of any listed impairment. T.23. According to Plaintiff, however, this mischaracterized Dr. Plotz's testimony.

When the ALJ asked the medical expert if any Listings were met, Dr. Plotz proceeded to testify that

> [h]e's had an MRI of the knee, which failed to reveal any internal derangement. He does not need surgery. He has, over the year[s], asked for and sometimes received, a brace, a cane; he's asked for a scooter, a wheelchair; none of which are indicated by the record. . . . His doctor did not let him have it. His doctor instead made a large note in capita[l] letters, saying, "He does not need a wheelchair. He needs to lose weight", and I'm sure he knows that. He has minimal osteoarthritis of the right knew. There's nothing wrong with his back. The examination is normal. . . . His problem is obesity.

T.49-50. Although Dr. Plotz did not immediately answer "yes" or "no" to the ALJ's question, the ALJ subsequently followed up and obtained clarification on this point, asking, "And doctor, by the way, did you give me your – does [he] meet or equal any listings?" T.21. Dr. Plotz replied, "No." Id. Thus, Plaintiff is incorrect in his recounting of the record. The ALJ did not err in stating that the medical expert testified that none of Plaintiff's impairments

met or equaled the criteria of any listed impairment.

Plaintiff relatedly contends that his obesity, in combination with his right knee impairment, medically equals Listing 1.02 because he has an inability to ambulate effectively as defined in § 1.02(A). That section requires "involvement of one major peripheral weight-bearing joint . . . resulting in inability to ambulate effectively, as defined in 1.00(B)(2)(b)." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.02(A). Section 1.00(B)(2)(b) defines the inability to ambulate effectively as an "extreme limitation of the ability to walk", characterized by "insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(1). Examples of "ineffective ambulation" include the inability to walk without a walker, two crutches, or two canes; the inability to use public transportation or carry out routine ambulatory activities (e.g., shopping and banking); and the inability to walk a block at a reasonable pace on rough or uneven surfaces. See 20 C.F.R., Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b)(2).

The burden is on Plaintiff, as the party claiming disability, to demonstrate that his impairment (or combination of impairments) meets or is equal in severity to a listed impairment based on medical evidence. Sullivan v. Zebley, 493 U.S. 521, 530 (1990).

Plaintiff can meet this burden by showing that he meets *all* of the specified criteria for the impairment set forth in the applicable listing. Id.; see also SSR 83-19, 1983 WL 31248, at *2 (S.S.A. 1983). Here, however, the record does not support a finding that Plaintiff is unable to ambulate effectively as defined in Section 1.00(B)(2)(b). For instance, consultative physician Dr. Dutta observed that Plaintiff was able to stand and walk without a brace or a wheelchair. T.286. Plaintiff reported to Dr. Dutta that he could clean, shop, shower, do laundry, and go out to different places. Dr. Plotz's testimony, quoted above, emphasized the lack of abnormalities on Plaintiff's MRI results, and the normal clinical findings on examination. Based on this evidence, Dr. Plotz opined that Plaintiff could stand and walk for 6 hours in an 8-hour workday. T.57. Moreover, Plaintiff's own statements undermine his argument concerning Listing 1.02, given that Plaintiff testified that he was able to shop, vacuum, sweep, do dishes, make the bed, carry up to 2 bags of groceries weighing up to 20 pounds, stand for "twenty minutes to [sic] more", and walk from 3 to 6 blocks with a rest period. T.42-43.

In sum, Plaintiff has failed to carry his burden of establishing that he meets a necessary criterion of Listing 1.02, namely, that he has an inability to ambulate effectively as defined in Section 1.00(B)(2)(b) of the Listings. Therefore, the ALJ did not err in finding that Plaintiff's knee impairment, standing alone

or in combination with his other impairments, met or equaled any listed impairment, including Listing 1.02.

### B. Erroneous Residual Functional Capacity Determination

After concluding that Plaintiff did not meet or equal the criteria of a listed impairment, the ALJ went on to determine that Plaintiff retains the residual functional capacity ("RFC") for the full range of light work as defined in 20 C.F.R. § 404.1567(b), i.e., that Plaintiff "can lift or carry ten pounds frequently and twenty pounds occasionally; and [can] stand, walk, and sit for six hours in an eight-hour workday." T.22. Plaintiff asserts that the ALJ erred in formulating his RFC assessment because he failed to request a medical source statement from any of Plaintiff's treating physicians.

Plaintiff argues that in order to fulfil his "affirmative obligation to develop the administrative record[,]" Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996), the ALJ was required to obtain a medical source statement from one of Plaintiff's treating physicians.[2] Relying on Tankisi v. Commissioner of Soc. Sec., 521 F. App'x 29 (2d Cir. 2013) (unpublished opn.), the Commissioner responds that the lack of a medical source statement from one of

---

[2] The Court notes that a medical questionnaire, T.253-64, was sent to Dr. Glenn Jacobson of the Queens Long Island Medical Group, P.C., as Plaintiff had listed Dr. Jacobson as one of his treatment providers. However, Dr. Jacobson apparently never completed and returned the questionnaire.

Plaintiff's treating sources does not constitute a gap in the administrative record sufficient to trigger the ALJ's duty to further develop the record, because the record here contained sufficient evidence to make an informed disability determination. See Tankisi, 521 F. App'x at 34 (although the administrative record did not contain "formal opinions" from treating physicians, a treating source had otherwise assessed claimant's limitations and multiple consultative examiners had completed functional assessments; therefore, remand based on ALJ's failure to request medical source statement from treating physician was not required).

Here, the ALJ had before him the consultative examination report in which Dr. Dutta assessed Plaintiff's functional limitations, and Dr. Plotz's expert testimony based on a review of the medical record. As noted above, consultative examiner Dr. Dutta opined that Plaintiff had no more than mild limitations in sitting and standing, and mild to moderate limitations in walking, bending, lifting, and carrying heavy weight on a continual basis on the right side. Dr. Dutta's report was not inconsistent with Plaintiff's treating physicians' findings. For instance, on September 3, 2010, Dr. Yee of the Queens Long Island Medical Group, P.C. stated in a brief letter that Plaintiff was being followed for internal derangement of the right knee, and that "[a]s of now he is to avoid prolonged standing and sitting", should use the elevator whenever possible, and avoid climbing, stooping and kneeling.

T.415. Dr. Yee did not place any other exertional limitations on Plaintiff. On September 20, 2010, Dr. Hwasun Lee of the Queens Long Island Medical Group, P.C. denied Plaintiff's request for a wheelchair, stating that "pt. do [sic] not need wheelchair, he need[s] to lose weight." T.447. Other clinical notes from Plaintiff's visits to the Queens Long Island Medical Group, P.C. fail to reveal severe symptoms or limitations due to Plaintiff's right knee internal derangement. See, e.g., T.437 (07/02/10 note by Dr. Michael Kang indicating, with regard to Plaintiff's knee, "ROM full", "mild effusion" (swelling), "NVI" (neurovascular intact), "no instability", "good strength"). An x-ray at Elmhurst Medical Offices on July 2, 2010, ordered by Dr. Kang, showed no joint calcifications, erosive changes or significant abnormal bone production" and "no evidence of fluid". T.438-439. Radiologist Andresito Pacis, M.D. stated that the x-ray "findings [were] in keeping with mild degenerative osteoarthritis of the right medial knee joint." T.439.

Under the particular circumstances of this case, the Court finds that the ALJ was not remiss with regard to his duty to request opinions from Plaintiff's treating sources. The report of consultative examiner Dr. Dutta and the expert testimony by Dr. Plotz were not inconsistent with the relatively benign clinical findings and assessments by Plaintiff's treating physicians, e.g., Dr. Lee, Dr. Yee, and Dr. Kang. Thus, the Court finds it doubtful

that a medical source statement from any of these providers would have altered the ALJ's assessment of Plaintiff's RFC. As in Tankisi, 521 F. App'x at 34, the record here was "adequate to permit an informed finding by the ALJ[,]" id. Therefore, remand is not required based on the ALJ's failure to request a medical source statement from one of Plaintiff's treating physicians.

### C. Erroneous Credibility Finding

Plaintiff contends that the ALJ misstated his testimony and failed to apply the appropriate legal standards in assessing his credibility.

An ALJ must consider the extent to which a claimant's subjective evidence of symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence. See 20 C.F.R. §§ 404.1529(a), (d). First, the ALJ must determine, based on the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain and other symptoms alleged" by the claimant. 20 C.F.R. § 404.1529(a). When the objective evidence alone does not substantiate the intensity, persistence, or limiting effects of the claimant's symptoms, the ALJ must assess the claimant's subjective complaints in light of a number of factors, including the claimant's daily activities; the type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; and other treatment received to relieve symptoms. 20 C.F.R. § 404.1529(c)(3).

Plaintiff first contends that the ALJ misstated his testimony by indicating in his decision that Plaintiff "reported he could carry more than twenty pounds[.]" T.25. The record reflects the following colloquy:

> ALJ: Can you carry 20 pounds with both hands?
> Plaintiff: No.
> ALJ: Twenty pounds?
> Plaintiff: Yeah, 20 pounds, yes; but more than that, no.

T.41.

"The ALJ's recitation of the facts contained in the credibility assessment must be accurate and contain an explanation why they undermine the credibility of the witness." Andrews v. Colvin, No. 6:12-CV-6651(MAT), 2013 WL 5878114, at *12 (W.D.N.Y. Oct. 30, 2013) (citing Horan v. Astrue, 350 F. App'x 483, 484, 2009 WL 3161379, at *1 (2d Cir. Oct.2, 2009)). Although Plaintiff is correct that the ALJ did not accurately quote the record in this regard, the Court finds that the error was harmless. As the Commissioner notes, the applicable regulations establish that light work involves lifting no more than 20 pounds at a time. See 20 C.F.R. § 404.1567(b). Since Plaintiff testified that he could lift up to and including 20 pounds, which is all that light work requires, the ALJ's misstatement did not affect the RFC assessment concluding that Plaintiff could perform a full range of light work.

Plaintiff also argues that the ALJ improperly questioned him in a "leading" manner with regard to his ability to walk. Plaintiff

cites no regulation or rule that the ALJ allegedly violated; rather, he argues that the ALJ's questions were designed to elicit a greater duration of ability to walk than that which Plaintiff initially estimated. Contrary to Plaintiff's contention, the bulk of ALJ's questions were open-ended rather than leading. For instance, the ALJ asked Plaintiff the following open-ended question: "What about walking? On a nice day, not too hot, not too cold, what's the furthest you can walk if you want to take a nice long walk?" T.42. After Plaintiff responded, "[m]aybe a block and a half[,]" he ALJ asked Plaintiff whether he could walk further if he rested, and Plaintiff responded, "yeah." T.43. The ALJ then asked how far Plaintiff could walk, if he alternated resting and walking. Plaintiff said that if he "rest[ed], say 10 minutes, [he] could go on for another two or three blocks . . . [b]efore [his] legs and [his] back start hurting [him] again." The ALJ summarized this response as "two or three blocks up from [his] house, and two or three blocks back[,]" to which Plaintiff replied, "Pretty much." Id. Thus, the only leading question on this topic was the last one, in which the ALJ accurately restated Plaintiff's testimony about the total duration he could walk.

Finally, Plaintiff argues that the ALJ employed an incorrect legal standard when he stated that Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms caused by his impairments were "not credible to the extent

they are inconsistent with" the ALJ's RFC assessment. The Court acknowledges it has found error in other cases where the ALJ rejected a claimant's subjective statements on the basis they are inconsistent with the ALJ's own opinion as to the claimant's RFC. This case is distinguishable, however, because the ALJ first evaluated Plaintiff's credibility by properly discussing Plaintiff's testimony regarding his symptoms and limitations with reference to the objective medical evidence, the various physicians' diagnoses and opinions, the expert testimony, and statements made by Plaintiff to his healthcare providers in clinical settings. Thus, despite the ALJ's use of shorthand which this Court has found unacceptable, the substance of the ALJ's analysis of Plaintiff's credibility was sufficiently specific and allowed the Court to confirm that it was based on a consideration of the appropriate regulatory factors and supported by substantial evidence.

    **D.**    **Failure of ALJ to Inform Plaintiff Regarding His Right to Cross-Examine the VE**

Plaintiff, who was not represented at the hearing, asserts that the ALJ did not advise him that he had the right to cross-examine the VE before closing the hearing. Plaintiff asserts that this was prejudicial because the ALJ relied on the VE's testimony at step five.

Courts in this Circuit have found that an ALJ's duty to develop the record involves the duty to instruct the claimant of

the right to subpoena and cross-examine witnesses called at the administrative hearing. See, e.g., Rodriguez v. Apfel, 96 CIV. 1132(LBS), 1997 WL 691428, at *4 (S.D.N.Y. Nov. 4, 1997) (citations omitted). Courts have found reversible error when an ALJ's failure to do so prejudiced the pro se claimant. E.g., Alvarez v. Bowen, 704 F. Supp. 49, 52 (S.D.N.Y. 1989) (citing Fernandez v. Schweiker, 650 F.2d 5, 8-9 (2d Cir. 1981); other citation omitted); Gullo v. Califano, 609 F.2d 649, 650 (2d Cir. 1979)).

In the present case, the Court finds that the ALJ erred in failing to explicitly inform Plaintiff that he had the right to cross-examine the VE. Notwithstanding the ALJ's failure to do so, Plaintiff did not suffer prejudice because he was permitted to, and did, ask questions of the VE. The ALJ is cautioned, in future cases, to ensure that he explicitly informs pro se claimants of their right to examine all witnesses who testify at their administrative hearings. See Cullinane v. Secretary of Dept. of Health and Human Servs., 728 F.2d 137, 139 (2d Cir. 1984).

## VI.  Conclusion

For the foregoing reasons, the Court finds that substantial evidence supports the Commissioner's decision, which was not marred by errors of law. Accordingly, Defendant's motion for judgment on the pleadings is granted, and Plaintiff's motion for judgment on the pleadings is denied.

**SO ORDERED.**

```
                              S/ Michael A. Telesca
                              _____
                              HONORABLE MICHAEL A. TELESCA
                              United States District Judge
```

DATED:     February 17, 2015
           Rochester, New York